# UNITED STATES v. YOUNG

No. 83–469.   Argued October 2, 1984—Decided February 20, 1985

2

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 20. STEVENS, J., filed a dissenting opinion, *post*, p. 35.

*Michael W. McConnell* argued the cause *pro hac vice* for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *Louis M. Fischer.*

*Burck Bailey* argued the cause and filed a brief for respondent.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to review the reversal of respondent's conviction because of prosecutorial comments responding to defense counsel's closing argument impugning the prosecution's integrity and belief in the Government's case.

## I

Respondent Billy G. Young, as vice president and general manager of the Compton Petroleum Corporation in Abilene, Texas, contracted in 1976 and 1977 to deliver monthly supplies of "sweet" crude oil to the Apco Oil Corporation refinery in Cyril, Oklahoma. Some 205,000 barrels of oil were delivered under the contract between January and September 1977, but more than half of the oil delivered to Apco, approximately 117,250 barrels, consisted of fuel oil, an already refined product less valuable than crude oil. Compton's invoices accompanying those deliveries falsely certified that all of the oil was crude. Apco relied on those false certifications and reported to the Federal Energy Administration, in compliance with Government regulations, 10 CFR §§ 211.66, 211.67, and 212.131 (1976), the amount of crude oil it thought it was refining each month. The Federal Energy Administration in turn relied on Apco's reports to determine the national averages of tier categories of refined oil for purposes of equalizing the cost of crude oil under its entitlement program.

Respondent's scheme to deceive Apco by selling it cheaper fuel oil masquerading as "sweet" crude oil was relatively simple. Respondent arranged with an oil brokerage firm, owned by a longtime friend, to procure fuel oil from another source and sell it to Compton under the false certification that it was crude oil. Compton would then pay the brokerage firm 10 cents per barrel commission as a fee for the "recertification." Once in Compton's storage tanks, respondent had the fuel oil disguised as crude oil before delivering it to Apco by blending condensate, a high gravity liquid taken from the wellheads of natural gas wells, with the fuel oil.[1] In September 1977, after an Apco technician performed a dis-

---

[1] Apco wanted a high gravity crude oil for gasoline production. A high gravity crude oil yields greater quantities of gasoline and diesel fuels after refining than does a lower gravity crude oil, which yields more fuel oil and asphalt. Fuel oil, on the other hand, has a low gravity and was neither what Apco needed nor what it thought it was buying.

4

tillation test on one of Compton's deliveries, Apco discovered that it had not been receiving crude oil as required by the contract, but rather a mixture of fuel oil and condensate. This discovery prompted the Federal Bureau of Investigation to launch an investigation which resulted in this prosecution.

On December 1, 1980, respondent and Compton were charged with 11 counts of mail fraud in violation of 18 U. S. C. § 1341, three counts of willfully and knowingly making false statements to a Government agency in violation of 18 U. S. C. § 1001, one count of interstate transportation of stolen property in violation of 18 U. S. C. § 2314, and with aiding and abetting in the commission of all 15 counts in violation of 18 U. S. C. § 2. A jury trial was held in the District Court for the Western District of Oklahoma.[2] In his own defense, respondent testified that he had knowingly purchased fuel oil and delivered it to Apco, but he claimed that he thought such fuel oil could legitimately be certified as crude oil. He also believed that if condensate were blended with fuel oil, the result would be the equivalent of crude oil. Because Apco had not complained about the deliveries before September 1977, respondent thought that Apco was satisfied with the quality of oil he was supplying.

At the close of the case, the prosecutor summarized the evidence against respondent. Defense counsel began his own summation by arguing that the case against respondent "has been presented unfairly by the prosecution," and that "[f]rom the beginning" to "this very moment the [prosecution's] statements have been made to poison your minds unfairly." Tr. 542. He intimated that the prosecution deliberately withheld exculpatory evidence, and proceeded to charge the prosecution with "reprehensible" conduct in purportedly attempting to cast a false light on respondent's activities. Defense counsel also pointed directly at the prosecutor's table and stated: "I submit to you that there's not a person in this

_____
[2] Prior to trial, the District Court accepted Compton's plea of *nolo contendere* and imposed a fine.

courtroom including those sitting at this table who think that Billy Young intended to defraud Apco." *Id.*, at 543–544. Finally, defense counsel stated that respondent had been "the only one in this whole affair that has acted with honor and with integrity" and that "[t]hese complex [Department of Energy] regulations should not have any place in an effort to put someone away." *Id.*, at 547.

The prosecutor did not object to defense counsel's summation, but in rebuttal argument he responded to defense counsel's claim that the Government did not believe in its own case:

> "I think [defense counsel] said that not anyone sitting at this table thinks that Mr. Young intended to defraud Apco. Well, I was sitting there and I think he was. I think he got 85 cents a barrel for every one of those 117,250.91 barrels he hauled and every bit of the money they made on that he got one percent of. So, I think he did. If we are allowed to give our personal impressions *since it was asked of me.*" *Id.*, at 549. (Emphasis added.)

Continuing with a review of portions of the evidence against respondent, the prosecutor responded to defense counsel's statement that Apco was not defrauded:

> "I don't know what you call that, I call it fraud.
> "You can look at the evidence and you can remember the testimony, you remember what [the witnesses] said and what [respondent] admitted they said. I think it's a fraud." *Id.*, at 550.

Finally, the prosecutor addressed defense counsel's claim that respondent had acted with honor and integrity. The prosecutor briefly recapped some of respondent's conduct and stated:

> "I don't know whether you call it honor and integrity, I don't call it that, [defense counsel] does. If you feel you should acquit him for that it's your pleasure. I don't

think you're doing your job as jurors in finding facts as opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in Oklahoma courtroom and say that's honor and integrity; I don't believe it." *Id.*, at 552.

In turn, defense counsel did not object to the prosecutor's statements. Nor did he request any curative instructions and none were given.

The jury returned a verdict of guilty as to each of the mail fraud and false statement counts. Respondent was acquitted of interstate transportation of stolen property. Respondent was sentenced to two years' imprisonment on each count, to be served concurrently, and was fined $39,000.

On appeal, respondent alleged that he was unfairly prejudiced by the prosecutor's remarks made during closing rebuttal argument. In a *per curiam* opinion, the Court of Appeals, one judge dissenting without opinion, reversed the conviction and remanded for retrial. 736 F. 2d 565 (CA10 1983). The Court of. Appeals held that the prosecutor's statements constituted misconduct and were sufficiently egregious to constitute plain error. In short, respondent's failure to object at trial was held not to preclude appellate review. Rejecting the Government's contention that the statements were invited by the defense counsel's own closing argument, the Court of Appeals stated that "the rule is clear in this Circuit that improper conduct on the part of opposing counsel should be met with an objection to the court, not a similarly improper response." *Id.*, at 570.

We granted certiorari, 465 U. S. 1021 (1984). We now reverse.

## II

The principal issue to be resolved is not whether the prosecutor's response to defense counsel's misconduct was appropriate, but whether it was "plain error" that a reviewing court could act on absent a timely objection. Our task is to

decide whether the standard laid down in *United States* v. *Atkinson*, 297 U. S. 157, 160 (1936), and codified in Federal Rule of Criminal Procedure 52(b), was correctly applied by the Court of Appeals.

Nearly a half century ago this Court counselled prosecutors "to refrain from improper methods calculated to produce a wrongful conviction . . . ." *Berger* v. *United States*, 295 U. S. 78, 88 (1935). The Court made clear, however, that the adversary system permits the prosecutor to "prosecute with earnestness and vigor." *Ibid.* In other words, "while he may strike hard blows, he is not at liberty to strike foul ones." *Ibid.*

The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone. Prosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence. Accordingly, the legal profession, through its Codes of Professional Responsibility,[3] and the federal courts,[4] have tried to police

---

[3] See, *e. g.*, ABA Model Code of Professional Responsibility DR 7–106(C) (1980), which provides in pertinent part:

"In appearing in his professional capacity before a tribunal, a lawyer shall not:

.        .        .        .        .

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

"(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to matters stated herein."

See also ABA Model Rules of Professional Conduct, Rule 3.4(e) (1984).

[4] See, *e. g.*, *United States* v. *DiPasquale*, 740 F. 2d 1282, 1296 (CA3 1984); *United States* v. *Maccini*, 721 F. 2d 840, 846 (CA1 1983); *United States* v. *Harrison*, 716 F. 2d 1050, 1051 (CA4 1983); *United States* v. *Bagaric*, 706 F. 2d 42, 58–61 (CA2 1983); *United States* v. *West*, 680 F. 2d 652, 655–656 (CA9 1982); *United States* v. *Garza*, 608 F. 2d 659, 665–666 (CA5 1979).

8

prosecutorial misconduct. In complementing these efforts, the American Bar Association's Standing Committee on Standards for Criminal Justice has promulgated useful guidelines, one of which states that

> "[i]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." ABA Standards for Criminal Justice 3–5.8(b) (2d ed. 1980).[5]

It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the conduct of prosecutors is circumscribed, "[t]he interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders." *Sacher* v. *United States*, 343 U. S. 1, 8 (1952). Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presen-

_____

[5] The remaining text of ABA Standards for Criminal Justice 3–5.8 (2d ed. 1980) provides:

"(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

.        .        .        .        .

"(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

"(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

"(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds."

The accompanying commentary succinctly explains one of the critical policies underlying these proscriptions:

"Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *Id.*, at 3·89.

tation of his case. See, *e. g.*, ABA Model Code of Professional Responsibility DR 7–106(C)(3) and (4) (1980), quoted in n. 3, *supra;* ABA Model Rules of Professional Conduct, Rule 3.4(e) (1984). Defense counsel, like his adversary, must not be permitted to make unfounded and inflammatory attacks on the opposing advocate.[6]

The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel. These considerations plainly guided the ABA Standing Committee on Standards for Criminal Justice in laying down rules of trial conduct for counsel that quite properly hold all advocates to essentially the same standards.[7] Indeed, the accompanying commentary points out that "[i]t should be accepted that both prosecutor and defense counsel are subject to the same general limitations in

---

[6] Of course, when defense counsel employs tactics which would be reversible error if used by a prosecutor, the result may be an unreviewable acquittal. The prosecutor's conduct and utterances, however, are always reviewable on appeal, for he is "both an administrator of justice and an advocate." ABA Standard for Criminal Justice 3–1.1(b) (2d ed. 1980); cf. *Berger* v. *United States,* 295 U. S. 78, 88 (1935).

[7] ABA Standard for Criminal Justice 4–7.8 provides:

"(a) In closing argument to the jury the lawyer may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct for a lawyer intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

"(b) It is unprofessional conduct for a lawyer to express a personal belief or opinion in his client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence, or to attribute the crime to another person unless such an inference is warranted by the evidence.

"(c) A lawyer should not make arguments calculated to inflame the passions or prejudices of the jury.

"(d) A lawyer should refrain from argument which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict.

"(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds."

the scope of their argument," ABA Standards for Criminal Justice 4–7.8, p. 4·97, and provides the following guideline:

> "The prohibition of personal attacks on the prosecutor is but a part of the larger duty of counsel to avoid acrimony in relations with opposing counsel during trial and confine argument to record evidence. It is firmly established that the lawyer should abstain from any allusion to the personal peculiarities and idiosyncrasies of opposing counsel. A personal attack by the prosecutor on defense counsel is improper, and the duty to abstain from such attacks is obviously reciprocal." *Id.*, at 4·99 (footnotes omitted).

These standards reflect a consensus of the profession that the courts must not lose sight of the reality that "[a] criminal trial does not unfold like a play with actors following a script." *Geders* v. *United States*, 425 U. S. 80, 86 (1976). It should come as no surprise that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused." *Dunlop* v. *United States*, 165 U. S. 486, 498 (1897).[8]

We emphasize that the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; "the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct." *Quercia* v. *United States*, 289 U. S. 466, 469 (1933). The judge "must meet situations as they arise and [be able] to cope with . . . the contingencies inherent in the adversary process." *Geders* v. *United States, supra,* at 86. Of course, "hard blows" cannot be avoided in criminal trials; both the prosecutor and defense counsel must be kept within appropri-

---

[8] Learned Hand observed: "It is impossible to expect that a criminal trial shall be conducted without some showing of feeling; the stakes are high, and the participants are inevitably charged with emotion." *United States* v. *Wexler*, 79 F. 2d 526, 529–530 (CA2 1935), cert. denied, 297 U. S. 703 (1936).

ate bounds. See *Herring* v. *New York*, 422 U. S. 853, 862 (1975).

### III

The situation brought before the Court of Appeals was but one example of an all too common occurrence in criminal trials—the defense counsel argues improperly, provoking the prosecutor to respond in kind, and the trial judge takes no corrective action. Clearly two improper arguments—two apparent wrongs—do not make for a right result. Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial. To help resolve this problem, courts have invoked what is sometimes called the "invited response" or "invited reply" rule, which the Court treated in *Lawn* v. *United States*, 355 U. S. 339 (1958).

The petitioners in *Lawn* sought to have the Court overturn their criminal convictions for income tax evasion on a number of grounds, one of which was that the prosecutor's closing argument deprived them of a fair trial. In his closing argument at trial, defense counsel in *Lawn* had attacked the Government for "persecuting" the defendants. He told the jury that the prosecution was instituted in bad faith at the behest of federal revenue agents and asserted that the Government's key witnesses were perjurers. The prosecutor in response vouched for the credibility of the challenged witnesses, telling the jury that the Government thought those witnesses testified truthfully. In concluding that the prosecutor's remarks, when viewed within the context of the entire trial, did not deprive petitioners of a fair trial, the Court pointed out that defense counsel's "comments clearly invited the reply." *Id.*, at 359–360, n. 15.

This Court's holding in *Lawn* was no more than an application of settled law. Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceed-

ing.  Instead, as *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.  In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly.  In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant.  See *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 242 (1940); *Crumpton* v. *United States*, 138 U. S. 361, 364 (1891).  Indeed most Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.[9]

In retrospect, perhaps the idea of "invited response" has evolved in a way not contemplated.  *Lawn* and the earlier cases cited above should not be read as suggesting judicial approval or—encouragement—of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process.  As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.

In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.  Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no

---

[9] See, *e. g.*, *United States* v. *DiPasquale*, 740 F. 2d, at 1296; *United States* v. *Maccini*, 721 F. 2d, at 846; *United States* v. *Harrison*, 716 F. 2d, at 1052; *United States* v. *Trujillo*, 714 F. 2d 102, 105 (CA11 1983); *United States* v. *West*, 670 F. 2d 675, 688–689 (CA7 1982); *United States* v. *Tham*, 665 F. 2d 855, 862 (CA9 1981); *United States* v. *Schwartz*, 655 F. 2d 140, 142 (CA8 1981) *(per curiam); United States* v. *Praetorius*, 622 F. 2d 1054, 1060–1061 (CA2 1979); *United States* v. *Kim*, 193 U. S. App. D. C. 370, 381–383, 595 F. 2d 755, 767–768 (1979).

more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.[10]

Courts have not intended by any means to encourage the practice of zealous counsel's going "out of bounds" in the manner of defense counsel here, or to encourage prosecutors to respond to the "invitation." Reviewing courts ought not to be put in the position of weighing which of two inappropriate arguments was the lesser. "Invited responses" can be effectively discouraged by prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate.

Plainly, the better remedy in this case, at least with the accurate vision of hindsight, would have been for the District Judge to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond. Arguably defense counsel's misconduct could have warranted the judge to interrupt the argument and admonish him, see *Viereck* v. *United States*, 318 U. S. 236, 248 (1943), thereby rendering the prosecutor's response unnecessary. Similarly, the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning and curative instruction to the jury. Defense counsel, even though obviously vulnerable, could well have done likewise if he thought that the prosecutor's remarks were harmful to his client. Here neither counsel made a timely objection to preserve the issue for review. See *Donnelly* v. *DeChristoforo*, 416 U. S. 637, 644 (1974). However, interruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously. At the very least, a bench conference might have been con-

---

[10] Assuming the prosecutor's remarks exceeded permissible bounds and defense counsel raised a timely objection, a reviewing court could reverse an otherwise proper conviction only after concluding that the error was not harmless. See *United States* v. *Hasting*, 461 U. S. 499 (1983).

14

vened out of the hearing of the jury once defense counsel closed, and an appropriate instruction given.

## IV

Here the Court of Appeals was not unaware of our holdings and those of other Circuits, but seemingly did not undertake to weigh the prosecutor's comments in context. The court acknowledged defense counsel's obvious misconduct, but it does not appear that this was given appropriate weight in evaluating the situation.

We share the Court of Appeals' desire to minimize "invited responses"; and we agree that the prosecutor's response constituted error. In addition to departing from the Tenth Circuit's "rule" prohibiting such remarks,[11] the prosecutor's comments crossed the line of permissible conduct established by the ethical rules of the legal profession, as did defense counsel's argument, see *supra*, at 6–10, and went beyond what was necessary to "right the scale" in the wake of defense counsel's misconduct. Indeed the prosecutor's first error was in failing to ask the District Judge to deal with defense counsel's misconduct.

As we suggested earlier, the dispositive issue under the holdings of this Court is not whether the prosecutor's remarks amounted to error, but whether they rose to the level of "plain error" when he responded to defense counsel. In this setting and on this record the prosecutor's response— although error—was not "plain error" warranting the court to overlook the absence of any objection by the defense.

---

[11] Until this decision, the Tenth Circuit's "rule" appeared largely as dicta in earlier opinions. See, *e. g.*, *United States* v. *Rios*, 611 F. 2d 1335, 1343 (CA10 1979); *United States* v. *Latimer*, 511 F. 2d 498, 503 (CA10 1975); *United States* v. *Martinez*, 487 F. 2d 973, 977 (CA10 1973); *United States* v. *Coppola*, 479 F. 2d 1153, 1163 (CA10 1973). But see *United States* v. *Ludwig*, 508 F. 2d 140, 143 (CA10 1974) (court recites rule in context of rejecting Government's argument that the prosecutor's concededly improper remarks were harmless error in light of defense counsel's conduct).

The plain-error doctrine of Federal Rule of Criminal Procedure 52(b)[12] tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," *United States* v. *Frady,* 456 U. S. 152, 163 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," *United States* v. *Atkinson,* 297 U. S., at 160. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States* v. *Frady,* 456 U. S., at 163, n. 14. Any unwarranted extension of this exacting definition of plain error would skew the Rule's "careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *Id.,* at 163 (footnote

---

[12] Federal Rule of Criminal Procedure 52(b) provides:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The Advisory Committee's Notes indicate that the Rule restated existing law as set forth by this Court in *Wiborg* v. *United States,* 163 U. S. 632 (1896):

"[A]lthough this question was not properly raised, yet if a plain error was committed in a manner so absolutely vital to defendants, we feel ourselves at liberty to correct it." *Id.,* at 658. See Advisory Committee's Notes on Fed. Rule Crim. Proc. 52(b), 18 U. S. C. App., p. 657.

A review of the drafting that led to the Rule shows that the Committee sought to enable the courts of appeals to review prejudicial errors "so that any miscarriage of justice may be thwarted." Advisory Committee on Rules of Criminal Procedure to the Supreme Court of the United States, Federal Rules of Criminal Procedure, Preliminary Draft 263 (1943).

The Committee's use of the disjunctive in the phrasing of the Rule is misleading, for as one commentator has noted, this "may simply be a means of distinguishing for definitional purposes between 'errors' (*e. g.,* exclusion of evidence) and 'defects' (*e. g.,* defective pleading)," and in either case the Rule applies only to errors affecting substantial rights. 8B J. Moore, Moore's Federal Practice ¶ 52.02[2], p. 52–4, and n. 7 (2d ed. 1984).

omitted). Reviewing courts are not to use the plain-error doctrine to consider trial court errors not meriting appellate review absent timely objection[13]— a practice which we have criticized as "extravagant protection." *Henderson* v. *Kibbe*, 431 U. S. 145, 154, n. 12 (1977); *Namet* v. *United States*, 373 U. S. 179, 190 (1963).

Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:

> "In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." *Johnson* v. *United States*, 318 U. S. 189, 202 (1943) (Frankfurter, J., concurring).

It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means. As the Court stated in *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S., at 240, "each case necessarily turns on its own facts."

When reviewed with these principles in mind, the prosecutor's remarks cannot be said to rise to the level of plain error. Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice. See *United States* v. *Frady*, *supra*, at 163; *United States* v. *Atkinson*, *supra*, at 160.[14]

---

[13] In *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150 (1940), for example, the Court held that "counsel for the defendant cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that [the prosecutor's] comments to the jury were improper and prejudicial." *Id.*, at 238–239.

[14] The Court of Appeals held that the prosecutor's improper remarks constituted "plain error" solely because the prosecutor ignored that court's

The prosecutor responded with his "personal impressio[n]," Tr. 549, that respondent intended to commit a fraud to answer defense counsel's accusation that no member of the prosecution team believed that respondent intended to defraud Apco. Indeed, the prosecutor made a point to preface his statement by summarizing defense counsel's acerbic charge and candidly told the jury that he was giving his "personal impressions" because defense counsel had asked for them.

Notwithstanding the defense counsel's breach of ethical standards, the prosecutor's statement of his belief that the evidence showed Apco had been defrauded should not have been made; it was an improper expression of personal opinion and was not necessary to answer defense counsel's improper assertion that no one on the prosecution team believed respondent intended to defraud Apco. Nevertheless, we conclude that any potential harm from this remark was mitigated by the jury's understanding that the prosecutor was countering defense counsel's repeated attacks on the

rule prohibiting such responses. A *per se* approach to plain-error review is flawed. An error, of course, must be more than obvious or readily apparent in order to trigger appellate review under Federal Rule of Criminal Procedure 52(b). Following decisions such as *United States* v. *Frady, United States* v. *Socony-Vacuum Oil Co., supra,* and *United States* v. *Atkinson,* federal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error not only seriously affected "substantial rights," but that it had an unfair prejudicial impact on the jury's deliberations. Only then would the court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice. To do otherwise could well lead to having appellate courts indulge in the pointless exercise of reviewing "harmless plain errors"—a practice that is contrary to the draftsmen's intention behind Rule 52(b), see n. 12, *supra,* and one that courts have studiously avoided and commentators have properly criticized, see, *e. g.,* 8B J. Moore, *supra,* § 52.02[2], at 52–3 to 52–4; 3A C. Wright, Federal Practice and Procedure § 856, p. 344 (2d ed. 1982). It should be noted that the Tenth Circuit seems to have retreated from its position that improper prosecutorial remarks are *per se* "plain error." *Mason* v. *United States,* 719 F. 2d 1485, 1489–1490 (1983).

prosecution's integrity and defense counsel's argument that the evidence established no such crime.

Finally, the prosecutor's comments that respondent had not acted with "honor and integrity," and his calling attention to the jury's responsibility to follow the court's instructions were in response to defense counsel's rhetoric that respondent alone was the sole honorable actor in "this whole affair," *id.*, at 547, and that the jury should not find respondent guilty simply because he could not understand applicable, but complex, federal regulations. The prosecutor was also in error to try to exhort the jury to "do its job"; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice, see, *e. g.*, ABA Standards for Criminal Justice 3–5.8(c) and 4–7.8(c). Given the context of the prosecutor's remarks and defense counsel's broadside attack, however, we conclude that the jury was not influenced to stray from its responsibility to be fair and unbiased.[15]

The concerns underlying our reactions against improper prosecutorial arguments to the jury are implicated here, but not to the extent that we conclude that the jury's deliberations were compromised. The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its

---

[15] The jury acquitted respondent of the most serious charge he faced, interstate transportation of stolen property. This reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly.

own view of the evidence.   See *Berger* v. *United States*, 295 U. S., at 88–89.

The prosecutor's statement of his belief that respondent intended to commit a fraud contained no suggestion that he was relying on information outside the evidence presented at trial.   He supported his comment by referring to respondent's own testimony that Compton received 85 cents a barrel for its deliveries to Apco and that respondent personally received a bonus of one percent of Compton's net profits, see Tr. 501–503; he then summarized portions of the evidence adduced at trial before suggesting to the jury that the record established the fraud charged.   Although it was improper for the prosecutor to express his personal opinion about respondent's guilt, see *Berger* v. *United States, supra,* at 88; ABA Standard for Criminal Justice 3–5.8(b), when viewed in context, the prosecutor's remarks cannot be read as implying that the prosecutor had access to evidence outside the record.   The jury surely understood the comment for what it was—a defense of his decision and his integrity—in bringing criminal charges on the basis of the very evidence the jury had heard during the trial.

Finally, the overwhelming evidence of respondent's intent to defraud Apco and submit false oil certifications to the Government eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury. Not a single witness supported respondent's asserted defense that fuel oil mixed with condensate could be certified and sold as crude oil, and several witnesses flatly rejected such a proposition, see Tr. 352–353, 393–395.   Indeed, respondent's crude oil trader testified that he had never heard of a firm legally blending fuel oil with condensate and stating that the mixture was crude oil.   See *id.,* at 359.   It was undisputed that respondent failed to advise Apco of what he was actually supplying and that the oil supplied did not meet the contract requirements.   See *id.,* at 358–359.

Moreover, the evidence established beyond any doubt whatever that respondent deliberately concealed his scheme to defraud Apco. Apart from enlisting the aid of an oil brokerage firm to "recertify" the fuel oil as crude oil, respondent on three separate occasions, when questioned by two Apco officials and by FBI agents, falsely denied that he was supplying fuel oil instead of crude oil, see *id.*, at 293–294, 357–358, 379, 496, 516. Under these circumstances, the substantial and virtually uncontradicted evidence of respondent's willful violation provides an additional indication that the prosecutor's remarks, when reviewed in context, cannot be said to undermine the fairness of the trial and contribute to a miscarriage of justice.

## V

On this record, we hold that the argument of the prosecutor, although error, did not constitute plain error warranting the Court of Appeals to overlook the failure of the defense counsel to preserve the point by timely objection; nor are we persuaded that the challenged argument seriously affected the fairness of the trial. Accordingly, the judgment of the Court of Appeals, ordering a new trial based on the prosecutor's argument, is reversed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

In his rebuttal argument to the jury, the prosecutor from the Criminal Fraud Section of the United States Department of Justice in Washington, D. C., (1) repeatedly stated his personal opinion that the respondent Billy G. Young was guilty of fraud, (2) used his prosecutorial "experience in these matters" in discussing the consequences of Young's conduct,

and (3) admonished the jurors that, if they voted to acquit, they would not be "doing your job as jurors." App. 8–11. The Government would justify the prosecutor's remarks as "invited" by the defense counsel's own improper arguments. In reversing Young's conviction, the Court of Appeals for the Tenth Circuit rejected this justification and emphasized that " '[w]e can give no comfort to the proposition that unprofessional conduct upon the part of defense counsel opens the door to similar conduct by government counsel.' " 736 F. 2d 565, 570 (1983), quoting *United States* v. *Ludwig*, 508 F. 2d 140, 143 (CA10 1974). Accordingly, the Court of Appeals held that "improper conduct on the part of opposing counsel should be met with an objection to the court, not a similarly improper response." 736 F. 2d, at 570.

This surely is a sensible conclusion and falls well within the authority of the courts of appeals to define reasonable rules of courtroom conduct. Because Young's counsel did not object to the prosecutor's misconduct, however, a reversal was proper only if the misconduct constituted plain error under Federal Rule of Criminal Procedure 52(b)—that is, if it either (1) had a prejudicial impact on the verdict when viewed in the context of the trial as a whole, or (2) "seriously affect[ed] the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson*, 297 U. S. 157, 160 (1936); see also *United States* v. *Frady*, 456 U. S. 152, 163, n. 11 (1982); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 239 (1940). The Court of Appeals noted the contours of this inquiry, and its opinion could perhaps be read as implicitly concluding that the prosecutor's misconduct substantially prejudiced the outcome of the trial or seriously affected the integrity of the proceedings. The court did not address the application of the plain-error standard to the facts of this case, however, but instead cryptically concluded that the challenged remarks "speak for themselves" and constituted "plain error." 736 F. 2d, at 570. Accordingly, I would

remand the case to the Court of Appeals for a proper plain-error inquiry.[1]

This analysis leads me to concur in much of the Court's opinion. Specifically, I agree fully with the Court's conclusion that federal prosecutors do not have a "right" of reply to defense improprieties, but must instead object to the trial judge and request curative action. Moreover, I join with the Court in concluding that federal courts may set reasonable rules of rhetorical conduct and that prosecutorial violations of such rules constitute error. And I concur that the judgment below cannot stand. However, I must respectfully but completely disagree with two other aspects of the Court's resolution of this case. First, the Court appears to adopt an "invited error" analysis, under which it only grudgingly acknowledges that the prosecutor acted improperly in this case. This approach leads the Court to minimize the gravity of the prosecutor's gross misconduct. Second, instead of remanding this case to the Court of Appeals, the Court reaches out to conduct the plain-error inquiry on its own. Even if the Court's conclusion is correct—and I have sub-

---

[1] The Tenth Circuit's statement that the prosecutor's remarks were "sufficiently egregious as to constitute plain error" could be read as concluding that the evidence of Young's guilt was not overwhelming. 736 F. 2d, at 570. Similarly, the Tenth Circuit's pointed discussion about the frequency with which "[t]he issue has come before this Court . . . in recent years" could be construed as suggesting that the Government's recurrent violations have seriously threatened the integrity of courtroom proceedings in that Circuit. *Ibid.* Although these are possible readings of the opinion below, the societal costs of reversing a conviction and requiring a retrial justify the requirement that an appellate court discuss the basis of its reasoning that prosecutorial misconduct is sufficiently egregious as to constitute plain error. Cf. *United States* v. *Hasting*, 461 U. S. 499, 528 (1983) (BRENNAN, J., concurring in part and dissenting in part) (courts should exercise supervisory powers to reverse convictions "only after careful consideration, and balancing, of all the relevant interests"). This Court's primary function is to ensure that such considered evaluation has been conducted by the court below. See *infra*, at 30–31, 33–35.

stantial misgivings about the thoroughness of the Court's analysis—I believe this unexplained departure from our usual practice misconceives the Court's institutional role and constitutes poor judicial administration.

## I

This Court only infrequently gives plenary consideration to cases involving standards of prosecutorial conduct. When we do, it is important that we attempt to set forth with clarity the standards by which federal prosecutors must guide their trial conduct.

## A

The Court granted the Government's petition for a writ of certiorari to resolve, *inter alia*, the question "[w]hether a prosecutor may rebut [improper] closing defense argument . . . by responsive argument that would be inappropriate in the absence of such provocation." Pet. for Cert. (I). The Government contends that we should recognize "a prosecutor's right to respond" to improper defense arguments and that, in light of this "right," we should hold that such responses "are not improper" even if standing alone they would be impermissible. Brief for United States 15–16.

Today the Court rejects this asserted "right" of reply, emphasizing instead that prosecutors have no "license to make otherwise improper arguments" in response to defense rhetoric, *ante*, at 12, and holding that the prosecutor's responses in this case "constituted error," *ante*, at 14. See also *ante*, at 12 (rejecting "judicial approval—or encouragement—of response-in-kind"), 14, 16–20. As the Court observes, "[c]learly two improper arguments—two apparent wrongs—do not make for a right result." *Ante*, at 11. Instead, the Court instructs, the proper recourse is an objection to the trial judge and "prompt action from the bench in the form of corrective instructions to the jury, and when

24

necessary, an admonition to the errant advocate." *Ante,* at 13.[2]

The Court today also reaffirms the authority of lower courts to define and enforce reasonable rules of prosecutorial conduct.[3] As the Court notes, the prosecutor in this case departed from Tenth Circuit precedents requiring prosecutors to object to defense misconduct rather than respond in kind; this action in and of itself "constituted error." *Ante,* at 14.

---

[2] In its 39-page brief, the Government devotes just one footnote in its effort to demonstrate the unreasonableness of requiring prosecutors to object to defense misconduct rather than according them a "right" of reply. See Brief for United States 23, n. 18: "We do not believe that the alternative proposed by the court of appeals (Pet. App. 11a)—objecting to an improper defense argument and requesting an instruction to the jury to disregard that argument—is sufficient to dispel the unfairness engendered by an argument like respondent's here. Such an instruction would not answer the factual assertion of prosecutorial hypocrisy that was made here." As the Court notes today, however, an objection followed by admonition or instruction is typically presumed to be sufficient to dispel prejudice. *Ante,* at 13. This presumption surely applies to the United States Government as well as to the accused.

[3] We have long recognized that the courts of appeals may prescribe rules of conduct and procedure to be followed by district courts within their respective jurisdictions. In *Cupp* v. *Naughten,* 414 U. S. 141, 146 (1973), for example, the Court observed that within the federal system an "appellate court will, of course, require the trial court to conform to constitutional mandates, but it may likewise require it to follow procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution." And in *Donnelly* v. *DeChristoforo,* 416 U. S. 637, 648, n. 23 (1974), the Court emphasized that "appellate courts, by proper exercise of their supervisory authority," should "discourage" prosecutorial misconduct. See also *Bartone* v. *United States,* 375 U. S. 52, 54 (1963) *(per curiam)* (courts of appeals have "broad powers of supervision" over federal proceedings); *Mesarosh* v. *United States,* 352 U. S. 1, 14 (1956); *McNabb* v. *United States,* 318 U. S. 332, 340 (1943) ("Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence").

## B

I fully agree with these conclusions. The Court goes on to suggest, however, that courts should apply an "invited error" analysis in determining the consequences of prosecutorial violations of these standards. Under this analysis, courts not only should determine the possible effect of the misconduct "on the jury's ability to judge the evidence fairly," but also should consider (1) "[d]efense counsel's conduct," and (2) whether the prosecutor "responded reasonably" under the circumstances. *Ante*, at 12. The conclusion is that prosecutorial misconduct, if "invited" by defense misconduct, will be excused if it "did no more than respond substantially in order to 'right the scale.'" *Ante*, at 12–13. See also *ante*, at 14.

I believe the Court's "invited error" analysis is critically flawed: it overlooks the ethical responsibilities of federal prosecutors and threatens to undercut the prohibition of prosecutorial misconduct in the first place. In addition, the Court's analysis is misapplied to the facts of this case.

To begin with, while the Court correctly observes that both sides are subject to ethical rules of rhetorical conduct, it fails completely to acknowledge that we have long emphasized that a representative of the United States Government is held to a *higher* standard of behavior:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . .

> ". . . Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger* v. *United States*, 295 U. S. 78, 88 (1935).

Accord, *Viereck* v. *United States*, 318 U. S. 236, 248 (1943). Cf. ABA Model Rules of Professional Conduct, Rule 3.8 comment (1984) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate"); ABA Model Code of Professional Responsibility EC 7–13 (1980) (prosecutor owes a "special duty"); ABA Standard for Criminal Justice 3–5.8, p. 3·88 (2d ed. 1980). I believe the Court trivializes these high standards by suggesting that a violation may be overlooked merely because the prosecutor decided *sua sponte* that he had to "right the scale."[4]

Moreover, the Court's suggestion that lower courts should evaluate prosecutorial misconduct to determine whether it was "reasonabl[e]" and "necessary to 'right the scale,'" *ante*, at 12, 14, is palpably inconsistent with the Court's conclusion that such misconduct "constitute[s] error." *Ante*, at 14; see also *ante*, at 11, 14, 16–20. As the Court observes, prosecutorial rhetoric of the sort in this case has "no place in the administration of justice and should neither be permitted nor rewarded." *Ante*, at 9. Such errors in appropriate cases might be determined to be harmless, but it is a contradiction in terms to suggest they might be "reasonabl[e]" or "necessary to 'right the scale.'" *Ante*, at 12, 14.

There was certainly nothing "reasonabl[e]" in this case about the prosecutor's responses to the concededly improper defense arguments. The defense counsel's most serious assertion was that the prosecutor did not believe Young had

---

[4] Excusing a federal prosecutor's courtroom misconduct merely on the ground that the prosecutor was responding to his adversary suggests, it seems to me, that a trial is something like a schoolyard brawl between two children. Such an excuse smacks of the "sporting theory of justice," a theory long recognized as "only a survival of the days when a lawsuit was a fight between two clans." Pound, The Causes of Popular Dissatisfaction with the Administration. of Justice, 29 A. B. A. Rep. 395, 404–406 (1906). If unethical arguments by the prosecutor in response to defense remarks constitute error, as the Court concedes, it is unclear why the error should be excused because the prosecutor wanted to "right the scale."

intended to defraud Apco.[5] The prosecutor's initial statement that he personally believed that Young had indeed intended to defraud Apco, while itself error, see *ante*, at 16–18, might be characterized as falling within the bounds of restrained reply.[6] But the prosecutor was not content to leave matters there. First, he repeatedly emphasized his personal opinion that Young was guilty of fraud.[7] Second, he made predictions about the continuing effects of Young's conduct based on his prosecutorial "experience in these matters."[8] Third, he warned the jurors that they would not be "doing your job as jurors" if they failed to convict Young.[9]

---

[5] "The indictment says that Billy Young is charged with intending to devise a scheme to defraud Apco and to obtain money and property by false and fraudulent pretenses. And I submit to you that there's not a person in this courtroom including those sitting at this table who think that Billy Young intended to defraud Apco." App. 5. The defense counsel also argued that the Government had tried the case "unfairly," and that Young was "the only one in this whole affair that has acted with honor and with integrity." *Id.*, at 4–7.

[6] "I think he said that not anyone sitting at this table thinks that Mr. Young intended to defraud Apco. Well, I was sitting there and I think he was." *Id.*, at 8.

[7] "I think he got 85 cents a barrel for every one of those 117,250.91 barrels he hauled and every bit of the money they made on that he got one percent of. So, I think he did. If we are allowed to give our personal impressions since it was asked of me. . . . I don't know what you call that, I call it fraud. You can look at the evidence and you can remember the testimony, you remember what they said and what he admitted they said. I think it's a fraud. . . . That's the whole point of the prosecution, it was a fraud." *Id.*, at 8–9.

[8] "He said—Mr. Bailey said Apco didn't lose, says doesn't think anyone will come back. Well, what he thinks they won't come back but my experience in these matters is when the government does something like this they're going to come back. All that money that Apco got for this stripper and new oil, Al Green at the Apco trust he's going to get some kind of invoices. That's what I think." *Id.*, at 10.

[9] "I don't know whether you call it honor and integrity, I don't call it that, Mr. Bailey does. If you feel you should acquit him for that it's your pleasure. I don't think you're doing your job as jurors in finding facts as

These arguments, which separately and cumulatively so clearly violated the disciplinary rules of our profession,[10] deserve stern and unqualified judicial condemnation. Yet the Court reserves the force of its ire for criticism of the *defense* counsel's behavior: the Court castigates the defense counsel's "attacks," "opening salvo," "going 'out of bounds,'" "misconduct," "obviously vulnerable" position, "obvious misconduct," "accusation[s]," "acerbic charge[s]," "breach of ethical standards," "improper assertion[s]," "repeated attacks," and "broadside attack[s]." *Ante*, at 12, 13, 14, 17, 18. In comparison, the Court appears only reluctantly to concede that "we agree that the prosecutor's response constituted error" because his remarks were "inappropriate," "should not have been made," and were "not necessary." *Ante*, at 14, 16, 17. This disparity of tone illustrates one of the major abuses of the "invited error" doctrine, an abuse often noted by the commentators.[11] Rather than apply the doctrine as a

---

opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in Oklahoma courtroom and say that's honor and integrity; I don't believe it." *Id.*, at 10–11.

[10] See, *e. g.*, ABA Model Code of Professional Responsibility DR 7–106(C) (1980), stating in relevant part:

"In appearing in his professional capacity before a tribunal, a lawyer shall not:

.       .       .       .       .

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

"(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to matters stated herein."

See also ABA Model Rules of Professional Conduct, Rule 3.4(e) (1984) (incorporating standards set forth above); ABA Standards for Criminal Justice 3–5.8(b) (2d ed. 1980) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant").

[11] See, *e. g.*, J. Stein, Closing Argument—The Art and the Law § 88 (1982); Alschuler, Courtroom Misconduct by Prosecutors and Trial Judges,

limited corrective, courts frequently employ it as a rule of unclean hands that altogether prevents a defendant from successfully challenging prosecutorial improprieties. Such use of the doctrine results, as it has today, in minimizing the gravity of virtually unchecked prosecutorial appeals going far beyond a "fair" response to the defense counsel's arguments.[12]

In further support of its analysis, the Court contends that while the underlying "concerns" of the legal and ethical strictures against improper prosecutorial arguments "are implicated here," they are not implicated in a serious way. *Ante*, at 18. The Court maintains, for example, that the prosecutor's arguments "contained no suggestion that he was relying on information outside the evidence presented at trial." *Ante*, at 19. I doubt very much, however, that the prosecutor ever testified or presented evidence about "my experience in these matters." App. 10. Moreover, the proscription against prosecutorial assertions of personal belief is obviously not concerned solely with references to nonrecord evidence. As the Court itself recognizes, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Ante*, at 18. Thus "improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger* v. *United States*, 295 U. S., at 88.[13] The

---

50 Texas L. Rev. 629, 657–658 (1972); Crump, The Function and Limits of Prosecution Jury Argument, 28 Sw. L. Rev. 505, 531–533 (1974).

[12] Under this sort of application of the invited-response rule, "[t]he prosecutor may deduce . . . that he would do well to watch carefully for certain mistakes that the defense counsel may make, and, instead of objecting if that course is open to him, attempt to take advantage of that mistake . . . ." Comment, Limitations Upon the Prosecutor's Summation to the Jury, 42 J. Crim. L., C. & P. S. 73, 81 (1951).

[13] See also *United States* v. *Bess*, 593 F. 2d 749, 755 (CA6 1979) ("Implicit in [a prosecutor's] assertion of personal belief that a defendant is

Court today acknowledges these risks, but then decrees that the prosecutor's assertions in this case cannot be construed as having "exploited the Government's prestige in the eyes of the jury." *Ante*, at 19. This cavalier assertion is wholly at odds with a longstanding presumption to the contrary, see *Berger* v. *United States, supra,* and the Court should at least provide a more reasoned basis for this striking departure.

Similarly, the prosecutor's admonition that the jurors would not be "doing your job as jurors" if they voted to acquit was neither invited nor excusable, as the Court concedes. *Ante,* at 18. Many courts historically have viewed such warnings about not "doing your job" as among the most egregious forms of prosecutorial misconduct. See, *e. g.,* Annot., 85 A. L. R. 2d 1132 (1962 and Supp. 1979). How possibly, then, can the Court characterize remarks such as these as a "defense" by the prosecutor "of his decision and his integrity in bringing criminal charges"? *Ante,* at 19.

## II

Although Young's counsel did not object to the prosecutor's arguments, those arguments nevertheless constitute plain error that require reversal of Young's conviction if they may be said either (1) to have created an unacceptable danger of prejudicial influence on the jury's verdict, or (2) to have "seriously affect[ed] the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson,* 297 U. S., at 160. The Tenth Circuit did not address the application of these standards to the facts of this case, see n. 1, *supra,* reversing instead simply on its conclusory finding that the prosecutor committed "plain error."

When we detect legal error in a lower court's application of the plain-error or harmless-error rules, as here, the proper

guilty, is an implied statement that the prosecutor, by virtue of his experience, knowledge and intellect, has concluded that the jury must convict. The devastating impact of such 'testimony' should be apparent").

course is to set forth the appropriate standards and then remand for further proceedings. We have followed this procedure in countless cases.[14] But the Court today reaches out without explanation and inappropriately decides the issue itself. Its analysis is flawed in several respects, and these flaws demonstrate the wisdom of leaving such inquiries in the first instance to the lower courts.

First, the Court's conclusion that the prosecutor's arguments could not have prejudiced Young rests in large part on its "invited error" analysis. The gravamen of its reasoning apparently is that, since the defense misconduct supposedly canceled out much of the prosecutor's excesses, the prosecutor's remarks were tied to the record evidence, and the jurors "surely understood" the prosecutor's rhetoric "for what it was," the prosecutor's unethical behavior could not likely have had a prejudicial impact on the jurors' deliberations. *Ante*, at 19. I have already demonstrated the fallacy of these underlying premises.

Second, the plain-error inquiry necessarily requires a careful review of the entire record to determine the question of possible prejudice. The Court in two brief paragraphs summarizes its review of the record and proclaims that the evidence of Young's guilt was "overwhelming" and supported the conviction "beyond any doubt whatever." *Ante*, at 19, 20. The Court invokes a curious analysis in support of this pronouncement: the fact that the jury acquitted Young on

---

[14] See, *e. g.*, *Kentucky* v. *Whorton*, 441 U. S. 786, 789–790 (1979) *(per curiam); Moore* v. *Illinois*, 434 U. S. 220, 232 (1977); *Moore* v. *United States*, 429 U. S. 20, 23 (1976) *(per curiam); Coleman* v. *Alabama*, 399 U. S. 1, 11 (1970); *Foster* v. *California*, 394 U. S. 440, 444 (1969); *Gilbert* v. *California*, 388 U. S. 263, 274 (1967); *United States* v. *Wade*, 388 U. S. 218, 242 (1967); *Ferguson* v. *United States*, 375 U. S. 962 (1964) (order). See also *Connecticut* v. *Johnson*, 460 U. S. 73, 102 (1983) (POWELL, J., dissenting) (question of an error's possible prejudice is "[n]ormally . . . a question more appropriately left to the courts below," in part because "[t]here may be facts and circumstances not apparent from the record before us").

"the most serious charge he faced . . . reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly." *Ante,* at 18, n. 15. If the evidence against Young was so "overwhelming," it is difficult to perceive why the jury would have returned a partial acquittal. The jury's decision can just as naturally be interpreted to suggest that the evidence was close and the verdict a compromise, thus supporting a belief that the prosecutor's assertion of personal knowledge and his exhortation to "do your job" did in fact have a prejudicial impact. Moreover, the Court minimizes the fact that mail fraud and the making of false statements are specific-intent crimes and that good faith therefore stands as a complete defense. See, *e. g., United States* v. *Martin-Trigona,* 684 F. 2d 485, 492 (CA7 1982) (mail fraud); *United States* v. *Lange,* 528 F. 2d 1280, 1287–1288 (CA5 1976) (false statements). The question of Young's specific intent to defraud necessarily turned on witness credibility, and in this context the prosecutor's misconduct may well have had a prejudicial impact on the jurors' deliberations. Although the Court is surely correct in emphasizing the impropriety of the crude oil condensate blending scheme that Young participated in, there was significant evidence that, if believed, might well have suggested Young's innocent though ignorant motives.[15]

---

[15] Young's defense was that he believed that the blending of crude oil condensate with Number 4 fuel oil, an "unfinished" oil under Government regulations, would yield a blend that could still properly be certified as "crude" under then-extant regulations. Young maintained that Kenneth Ross, then an officer at Prime Resources Corporation, had convinced him that such certification was permissible. Tr. 78, 514. Ross denied that he had so persuaded Young, and the dispute turned on the jurors' credibility determinations. There was substantial testimony from Government witnesses that the blending of crude oil condensate with other oil was a common industry practice, albeit not the blending of condensate with fuel oil. *Id.,* at 55, 59, 69, 361, 392. There was also testimony that the highest-quality crude condensate, when mixed with Number 4 fuel oil, yielded a blend superior to some lower-quality crudes. *Id.,* at 55–56, 384, 427. Moreover, Apco received this blend for seven months, tested it, and

Third, the Court altogether fails to consider whether the prosecutor's gross misconduct and flouting of the professional canons "seriously affect[ed] the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson*, 297 U. S., at 160; see also *United States* v. *Frady*, 456 U. S., at 162, n. 11; *Brasfield* v. *United States*, 272 U. S. 448, 450 (1926). From the citations in the Tenth Circuit's opinion, see 736 F. 2d, at 570, it would appear that prosecutorial improprieties of the sort committed in this case may present a recurring problem. This Court is in no position at this time to pass judgment on the gravity of the problem and the panel's apparent concern that the prosecutor's misconduct in this case compromised the integrity and public reputation of the Circuit's administration of justice. Clearly a remand to address the question is necessary.[16]

These deficiencies in the Court's plain-error analysis reinforce the conviction that it was poor judicial administration

reported no untoward results; it was only when another company attempted to pass off unadulterated low-quality fuel oil that Apco became concerned. *Id.*, at 364–366, 412. Young, who had an eighth-grade education, maintained that he had thought Government regulations permitted his manner of certification; Government witnesses agreed that it was difficult to "make a lick of sense" out of the complex standards. *Id.*, at 367. Finally, Government witnesses themselves testified that they did not believe that Young had intended to defraud Apco, that many others had been aware of the scheme, and that others had taken advantage of Young. *Id.*, at 57–58, 78–80.

[16] The Court suggests that plain error may be found *only* where the error "had an unfair prejudicial impact on the jury's deliberations." *Ante*, at 17, n. 14. Plain error also may be grounded, however, on those errors that "seriously affect the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson*, 297 U. S. 157, 160 (1936). I believe that certain extreme circumstances, such as egregious misbehavior or a pattern and practice of intentional prosecutorial misconduct that has not been deterred through other remedies, may well so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine. Cf. *United States* v. *Hasting*, 461 U. S., at 527 (BRENNAN, J., concurring in part and dissenting in part) (supervisory powers).

for the Court to embark on its inquiry in the first place. Our traditional practice has been to leave fact-bound questions of possible prejudicial error to the lower courts on remand. See *supra*, at 30–31, and n. 14. Two important considerations undergird this practice. First, the function of this Court is not primarily to correct factual errors in lower court decisions, but instead to resolve important questions of federal law and to exercise supervisory power over lower federal courts. Our institutional role properly is focused on ensuring clarity and uniformity of legal doctrine, and not on the case-specific process of reviewing the application of law to the particularized facts of individual disputes—one of the functions performed quite capably by the federal courts of appeals. This allocation of responsibilities can result in subtle but vitally important differences in institutional outlook, differences that should not be shortcut simply because a majority decides the evidence of a particular defendant's guilt is "overwhelming" and "established beyond any doubt whatever." *Ante*, at 19, 20.

Second, if the Court is to be evenhanded in its willingness to review lower courts' plain-error and harmless-error determinations, we will be required to undertake such analyses with ever-increasing frequency. Yet this Court simply is not institutionally capable of conducting the sort of detailed record analyses required in properly administering the plain-error and harmless-error doctrines.

> "This Court is far too busy to be spending countless hours reviewing trial transcripts in an effort to determine the likelihood that an error may have affected a jury's deliberations. . . . As a practical matter, it is impossible for any Member of this Court to make the kind of conscientious and detailed examination of the record that should precede a determination that there can be no reasonable doubt that the jury's deliberations as to [the] defendant were not affected by the alleged error. And it is an insult to the Court of Appeals to imply, as the

Court does today, that it cannot be trusted with a task that would normally be conducted on remand." *United States* v. *Hasting*, 461 U. S. 499, 516–517 (1983) (STEVENS, J., concurring in judgment).

Surely the Court's time could have been better spent than on familiarizing ourselves in this case with the details of crude-oil refining and blending processes; the relative gravities and qualities of sweet crude, crude-oil condensate, and Number 4 fuel oil; long-rescinded Government regulations; various oil-industry testing procedures; and the complex of companies and individuals with whom Billy G. Young interacted— matters that are all important to a fair evaluation of Young's defense, but that necessarily are limited to the facts of this isolated case.

JUSTICE STEVENS, dissenting.

In *Namet* v. *United States*, 373 U. S. 179 (1963), the Court recognized that even in the absence of an objection, trial error may require reversal of a criminal conviction on either of two theories: (1) that it reflected prosecutorial misconduct, or (2) that it was obviously prejudicial to the accused. *Id.*, at 186–187. In that case, after determining that the challenged error did not satisfy either standard, *id.*, at 188–189, the Court concluded that it saw "no reason to require such extravagant protection against errors which were not obviously prejudicial and which the petitioner himself appeared to disregard." *Id.*, at 190.[1] It therefore affirmed the judgment of the Court of Appeals in that case.

---

[1] The Court appended the following footnote:

"Finding, as we do, that this case involves neither misconduct by the prosecution nor inferences of material importance, we need not pass upon the holding in *United States* v. *Maloney*, [262 F. 2d 535 (CA2 1959)], that a failure to give proper curative instructions when such elements are present constitutes plain error." 373 U. S., at 190, n. 10.

See also *Henderson* v. *Kibbe*, 431 U. S. 145, 154, n. 12 (1977).

In this case the Court has unanimously concluded that the prosecutor's response to defense counsel's closing argument constituted error.[2]   It has thus decided against the Government the principal question that its petition for a writ of certiorari presented.[3]   The Court has also unanimously concluded that "the prosecutor's comments crossed the lines of permissible conduct established by the ethical rules of the legal profession." *Ante,* at 14; see also *ante,* at 25–26 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and dissenting in part).   Thus, at least one of the elements that was absent in *Namet* is present here.

With respect to the second element—prejudice—there is disagreement and, I submit, some confusion within the Court.   The majority opinion carefully avoids denying that the prosecutorial misconduct was prejudicial to the accused. Instead, it concludes that the error did not "unfairly" prejudice the jury, *ante,* at 19, partly because the error was invited by defense counsel's misconduct and partly because the Court is convinced that respondent is guilty.[4]   JUSTICE BRENNAN, on the other hand, correctly explains why this Court should permit the Court of Appeals to decide whether

---

[2] *Ante,* at 14, 16–20; *ante,* at 26–30 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and dissenting in part).

[3] The principal question asked:

"Whether a prosecutor may rebut closing defense argument impugning the integrity of the prosecution and asserting that the prosecutors themselves do not believe in the defendant's guilt by responsive argument that would be inappropriate in the absence of such provocation."

[4] *Ante,* at 17–19.   I do not, of course, suggest that it is improper for the Court to evaluate the probable impact of the error on the outcome of the case.   It is important to remember, however, that the question is not whether the judge is persuaded that the defendant is guilty, but "rather what effect the error had or reasonably may be taken to have had upon the jury's decision.   The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting." *Kotteakos* v. *United States,* 328 U. S. 750, 764 (1946).

the error was "plain" or "harmless." He therefore would send the case back to that court to perform that task.[5]

In my opinion, it is perfectly clear that the Court of Appeals has already made that determination. I do not understand how anyone could dispute the proposition that the prosecutor's comments were obviously prejudicial. Instead, the question is whether the degree of prejudice, buttressed by the legitimate interest in deterring prosecutorial misconduct, is sufficient to warrant reversal. On that question, the factor of judgment necessarily plays a critical role.[6] I am persuaded that a due respect for the work of our circuit judges, combined with a fair reading of their opinion in this case, warrants the conclusion that they have already done exactly what JUSTICE BRENNAN would have them do again.

The Court of Appeals' opinion took note of defense counsel's failure to make an objection to the improper argument, but nevertheless accepted the contention on appeal that "the prosecutor's conduct substantially prejudiced the Appellant at trial." App. to Pet. for Cert. 9a. After reviewing relevant portions of the transcript that "speak for themselves," *id.*, at 10a, and considering other Tenth Circuit cases dealing with "prejudicial statements made by the prosecution during

---

[5] *Ante*, at 30–35 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and dissenting in part).

[6] The Court has commented on the difficulty of applying the harmless-error standard:

"This, in part, because it is general; but in part also because the discrimination it requires is one of judgment transcending confinement by formula or precise rule. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 240. That faculty cannot ever be wholly imprisoned in words, much less upon such a criterion as what are only technical, what substantial rights; and what really affects the latter hurtfully. Judgment, the play of impression and conviction along with intelligence, varies with judges and also with circumstance. What may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another." *Kotteakos* v. *United States*, 328 U. S., at 761.

argument to the jury," *ibid.*, the Court of Appeals expressly concluded that "the above quoted remarks were sufficiently egregious as to constitute plain error." *Ibid.* I have no doubt that the judges of the Court of Appeals for the Tenth Circuit are familiar with the difference between "harmless error" and "plain error."[7] Rather than asking those judges to supplement the opinion they have already written, I would simply affirm their judgment.

---

[7] Rule 52 of the Federal Rules of Criminal Procedure, which is entitled "Harmless Error and Plain Error," reads as follows:

"(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the Court."

The note of the Advisory Committee to Rule 52(b) reads as follows:

"This rule is a restatement of existing law, *Wiborg* v. *United States,* 163 U. S. 632, 658 . . . ; *Hemphill* v. *United States,* 112 F. 2d 505, C. C. A. 9th, reversed 312 U. S. 657, . . . conformed to 120 F. 2d 115, certiorari denied 314 U. S. 627 . . . . Rule 27 of the Rules of the Supreme Court, 28 U. S. C. foll. § 354, provides that errors not specified will be disregarded, 'save as the court, at its option, may notice a plain error not assigned or specified.' Similar provisions are found in the rules of several circuit courts of appeals." 18 U. S. C. App., p. 657.